**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 21-CR-308 (JEB)** |
| | : | |
| **v.** | : | **Sentencing Date: July 16, 2021** |
| | : | |
| | : | **18 U.S.C. § 1001(a)(2)** |
| **HANNIBAL KOKAYI,** | : | **(False Statements)** |
| **Defendant.** | : | |
| | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM AND
MOTION FOR UPWARD VARIANCE FROM GUIDELINES RANGE**

On May 3, 2021, Hannibal Kokayi ("KOKAYI") pled guilty to one count of Making a False Statement in a Federal Bureau of Investigation ("FBI") investigation. The defendant's conduct in this case was serious and materially impacted a counter-terrorism investigation into activities of the Islamic State in Iraq and al-Sham ("ISIS") and its supporters in the United States. As delineated in his Statement of Offense, since 2004 ISIS and its predecessors have been designated by the U.S. Secretary of State as a Foreign Terrorist Organization ("FTO") and as a Specially Designated Global Terrorist ("SDGT"). Further, as is described more fully in his Statement of Offense, KOKAYI was an ISIS supporter who was radicalized in part by P-1, a radical Jamaican cleric who has regularly espoused support for ISIS and who was designated by the United States Office of Foreign Asset Controls ("OFAC") as a Specially Designated Global Terrorist ("SDGT") in December 2017. Since September 22, 2014 ISIS has advocated for the death of Americans and Europeans, including civilians, by any means necessary, including beheading, and ISIS's leadership gave blanket approval for indiscriminate killing by people residing in these countries. In August 2014, KOKAYI's mother (P-2) married P-1 and moved to

1

Jamaica to live with P-1.   Thereafter, P-1 had direct and indirect contact with KOKAYI, P-2, P-3, P-4, P-6, P-7, P-8 and P-9 (who is Victor Ramos Sanchez ("SANCHEZ").[1]   During this period, KOKAYI and several of these persons (the "Hijrah Group") became convinced that ISIS was a real Caliphate, and the Hijrah Group agreed to travel to ISIS territory to support ISIS by committing violent jihad against ISIS' enemies.   The FBI interviewed KOKAYI on two occasions in July and August 2018.   In each interview, KOKAYI repeatedly made numerous and material false statements about his desire to travel to ISIS territory, his knowledge of others who supported ISIS and wanted to perform jihad on behalf of ISIS, his preparations to be able to fight jihad, and his efforts to recruit and radicalize others in the United States to support ISIS and to perform hijrah[2] to ISIS territory.

As discussed further below, the government believes that a period of 24 months of incarceration is appropriate, to be followed by a maximum term of supervised release (36 months) with special conditions that reflect the seriousness of his conduct and will mitigate any further risk he may pose to the community.

**Factual Summary**

## A. The Defendant Is an ISIS Sympathizer Who Wished to Travel Abroad to Fight Violent Jihad and Die a Shaheed (Martyr)

Starting in or about August 2014, KOKAYI and a small group of his fellow Muslim friends

---

[1] Sanchez has pled guilty to making false statements to the Federal Bureau of Investigation ("FBI") in this same investigation in United States v. Victor Sanchez, 20-CR-291 (JEB), and is due to be sentenced before this Court on July 23, 2021.

[2] Hijrah is an Arabic term for migration usually to a Muslim land.   As used by KOKAYI and others relevant to this case, hijrah meant travel to ISIS territory to commit jihad.

and family members became enamored with ISIS and devoted significant time to obtain ISIS propaganda.   This activity commenced approximately the same time that P-1 married KOKAYI's mother, P-2.   KOKAYI, SANCHEZ, P-3, P-4 (KOKAYI's brother), P-6, and P-8 also regularly listened to P-1's speeches and lectures through the Internet at KOKAYI's home in the District of Columbia, in which P-1 instructed Muslims that it was their religious obligation as Muslims to give their allegiance to ISIS' leader, Abu Bakr Al-Baghdadi (another SDGT), immigrate to ISIS territory ("hijrah"), and support ISIS's military struggle and jihad against any nonbelievers. KOKAYI and members of the Hijrah Group agreed that ISIS was a legitimate Caliphate, and that they were religiously required to travel to Syria/Iraq to perform hijrah to fight jihad (actual war fighting) for ISIS.   The Hijrah Group consisted of KOKAYI, P-3, P-4, P-8 and SANCHEZ.   The members of the Hijrah Group believed that fighting jihad for ISIS was religiously required of them, and that if they died fighting for the Caliphate that they would die as shaheeds, or martyrs, who would go to Paradise and gain religious privileges and respect in the afterlife.   Between at least August 2014 and March 2017, KOKAYI and other members of the Hijrah Group regularly found, watched, and shared ISIS videos and propaganda (including on-line magazines and videos) that graphically showed violent attacks against civilians and the gruesome murder, immolation, and decapitation of ISIS captives.   For example, on October 25, 2014, P-4 accessed Twitter accounts of known ISIS supporters and took the following screenshot.





P4 then distributed the picture to KOKAYI and others from the HIJRAH GROUP, and KOKAYI acknowledged he was following the ISIS fighter as well.   They had the following conversation:

| P-4 | I remember him from Twitter his name was familiar. Abu dujana. May Allah give him shahada Ameen! |
|-----|------------------------------------------------------------------------------------------------------|

| KOKAYI | No way man I've been Lookin for him |
|---|---|
| P-4 | Yea man subhanallah I was surprised too |
| KOKAYI | I used to follow his accounts everytime he'd make a new one then he just stopped Makin em. Ameen |
| KOKAYI | Why are his eyes blue that's so cool lol |
| SANCHEZ | Ameen SubhanAllah is there something where I can read about him, I've never heard of him |
| P-4 | Yea that's what a lot of people are talking about. Inshallah it is good news for him, cause no one had seen anything like it |
| P-4 | His last few post  |

| SANCHEZ | May Allah elevate his status,   forgive &erase his bad deeds and multiply his good deeds, that picture I wonder what caused it, btw was he light skinned or is it just the black and white pic that makes look that way |
|---------|---|
| P-4 | Ameen! Honestly I'm not sure |

When watching ISIS propaganda that included gruesome execution scenes, KOKAYI and others in the Hijrah Group would respond with happiness, support for ISIS, and cheers of "Allah Akbar!"   For example, on February 15, 2015, SANCHEZ distributed to the Hijrah Group an ISIS propaganda video showing a bloody, mass beheading execution video of 21 Coptic Christians prisoners by ISIS fighters in Libya, that included direct ISIS threats against the West.   The Group had the following conversation:

| SANCHEZ | Get it while it's hot!!<br>مركز الحياة للإعلام: رسالة موقعة بالدماء إلى أمة الصليب"" on YouTube ""Watch<br>مركز الحياة للإعلام : رسالة موقعة بالدماء إلى أمة الصليب:<br>http://youtu.be/IlUYpZSvm5g |
|---------|---|
| P-3 | Daaaaaaang lol so much blood |
| P-4 | ☺☺☺☺☺💀☠<br>👆👆[3] Allahu Akbar |

In another, on April 24, 2015, KOKAYI distributed to members of the Hijrah Group another ISIS propaganda video that describes ISIS official actions taken in Syrian and Iraq, and then showing

---

[3] The single index finger pointing up emoji was regularly used by ISIS supporters in social media to refer to its belief that Allah is the only true God and that Muhammad is his prophet. It has been used in official ISIS social media postings and propaganda.

a mass beheading execution video of two separate groups of Christian prisoners by ISIS fighters in Libya.   The video also contained threats from ISIS to the West and the United States. The Group had the following conversation (emphasis added):

| KOKAYI | This is it [P-4] watch it ASAP http://baaqiya.web.tv/video/until-there-came-to-them-clear-evidence-eng-sub__njuikweevjy |
|---|---|
| KOKAYI | All other English links keep getting taken down |
| P-8 | Sweet thanks 😄😄 |
| KOKAYI | Lol no problem   [...] |
| *P-4* | *Allahu Akbar that was a tough video.* 👍 |
| P-8 | Thanks for providing the English sub Hannibal |
| P-8 | Mashallah it was good |

KOKAYI and other members of the Hijrah Group also attempted to recruit others to support ISIS by selectively introducing Muslim friends to ISIS propaganda and ideology.   In a number of cases, members of the Hijrah Group would invite these persons to KOKAYI's home in the District of Columbia (which P-2 owns) to show them less violent ISIS propaganda videos or lectures by P-1 to ascertain their views about ISIS, and to debate them if their views differed from those of the Hijrah Group.   For example, on October 28, 2014, P-2, P-4 and KOKAYI had the following conversation about KOKAYI's attempt to convince a woman that ISIS (referred to as dawla) was correct (emphasis added):

| P-2 | *People who are weak in faith refute the dawla.   Its real and they need to deal with it.* |
|---|---|
| P-2 | *What Muslim in their sane mind doesnt want to live inder [sic] laws set by Allah* |
| P-2 | *How can u take ur information from the enemy of Islam and believe it* |
| P-4 | Yessir I told him already |
| KOKAYI | Obviously [P-2] |
| KOKAYI | To be honest though I've dealt with Syrians worst than her so she's easy. Just gotta find a way to check mate her on women stuff that's why I was tryna know more[…] |
| P-2 | U cant make ppl believe correctly.   Give her info and move on |
| P-2 | If a sunni got killed it was only bcz they fought them |
| KOKAYI | Soooo many ppl do [P-2] lol which is why I keep getting into it with other. But yea I get that in her case I can see its other things islamically that she believes she knows but doesn't agree with, doesn't exist.   Its her belief that needs strengthening.   I see it all the time when we debate.   I notice why she sees certain things certain ways because of the lack of knowledge in Islam. Smart in a lot of other things not islam lol |
| P-2 | *The mujahedeen escorted them peacefully* |
| P-2 | They left |
| P-2 | Indian's were given a choice to leave or fight and die |
| P-2 | Jiziya[4] |
| P-2 | Christians are allowed to live there and pay a tax |
| P-2 | *That's clear propaganda! OMG! The only killed shia who aren't muslim, yazidi who worship the devil and others who fight against them* |
| P-2 | *Its a battle to win the hearts and minds of the muslim who are waking up and seeing what is happening to muslims around the world dispite their propaganda campaign* |

---

[4] Jizya is Arabic for taxes levied upon non-Muslims under Sharia law.

| KOKAYI | True true she doesn't like the how they came and took over the Syrian Revolution.   Says majority of ppl they killed were Sunnis yadda yadda   I don't believe that.   So I told her instead of going to the sources you frequent check it out from the other side another perspective […] |
| --- | --- |
| P-2 | Btw a huge number of the Yazidi women bcm muslim |
| KOKAYI | *I don't tell ppl my true thoughts.   I always take the other approach […]* |
| P-2 | *We don't know her- she can misconstrew what u say bcz u pro dawla* |

KOKAYI and members of the Hijrah Group also agreed that they needed to prepare for hijrah, take security precautions to avoid being caught by law enforcement, and save money in order to make the journey.   Factual Proffer at ¶ 5.   They also encouraged one another to perform hijrah as soon as they could.   Id.   KOKAYI and other members of the Hijrah Group took numerous steps to prepare themselves for hijrah and jihad.   KOKAYI and other members of the Hijrah Group regularly went to play paintball and visited gun ranges to learned to fire a number of different firearms, in part to prepare themselves for hijrah and jihad.   Id.   The following is illustrative of a chat with the Hijrah Group in December 2014 that indicates KOKAYI's mindset (emphasis added):

| KOKAYI | Yu [P-4] remember [P-10] and [P-11]? |
| --- | --- |
| SANCHEZ | No |
| P-4 | From where? […] |
| KOKAYI | And [P10] was that UH syrian or somethin guy hung out with [W-1] and [W-2] and them. Had shoulder length hair and had a bro named [P11] whom he looked almost exactly alike ring a bell? |
| P-4 | Yea sounds familiar, what about him? […] |

| KOKAYI | Haven't you noticed he's been missin a year? |
|--------|----------------------------------------------|
| P-4 | Yea I haven't really seen him in a minute, have you heard something about him |
| KOKAYI | ***Just found out today him and his bro went there to fight. And I think both were killed. Inna lillahi wa Inna ilayhi rajioon[5.] iA allah accepts them as shaheed.[6]*** |
| P-4 | ***Subhanallah, Ameen!!*** |
| P-4 | ***Allahu Akbar*** 👆 |
| KOKAYI | [sends a group image with P-10 to Hijrah Group] |
| KOKAYI | Far left member? Shoot man |
| P-4 | How did you find out? And can you send me a pic. I can't remember their faces |
| Sanchez | Ameen[7] |
| P-4 | ***Alhumdulillah[8] man, inshallah they are both shaheeds*** 👆***. May Allah unite us with them inshallah in jannah[9] as green birds[10]*** |
| KOKAYI | Went to Umd and got bubble tea with [W-3] and she was tellin me about it Cuz she just found out. They were close friends so she was |

---

[5] "Inna lillahi wa inna ilayhi raji'un" is a verse from the Qur'an that means "Verily we belong to Allah, and verily to Him do we return."

[6] Shaheed means a Muslim who had sacrificed his life for his religion, and who will reap certain benefits after death in Paradise.

[7] An Arabic phrase used after prayers, meaning "Amen."

[8] An Arabic term meaning "praise be to God."

[9] Jannah means Paradise in Arabic.

[10] The image of a green bird is a reference to a passage from the hadith, which indicates the souls of martyrs (shaheeds) will reside in bodies of green birds next to the Prophet in paradise. The green bird is a common symbol of ISIS supporters.

| | |
|---|---|
| | blown that he just up and left without Sayin bye so I explained pretty much the stuff that was going on there |
| P-4 | Oh ok gotcha, what was his name on fb. Tryna look him up |
| KOKAYI | *Yea man iA I was like Subhanallah. I just really hope they found the right group or had the right intention. But Ameen iA we join em* |
| P-4 | *Inshallah they did, I'm happy for them tho* 😏.[11] *If their intentions were pure n they were doing it for the right reason they have succeeded n beat us too it. May Allah shower us with patience we need to make it. Ameen!!* |
| KOKAYI | *Exactly man that's what I keep thinkin. Ameen.* And it's [P-10] don't just look at his page but post that were written about em cuz [W-4] wrote somethin sayin they passed […] |
| P-4 | I've seen it subhanallah, may Allah reward them with a great reward Ameen ! |

The Hijrah Group also obtained information from ISIS sources to educate themselves how to travel to ISIS border areas in Turkey and elsewhere, and how to hide their intent to perform hijrah and fight jihad from law enforcement and border officials.   For example, on February 6, 2015, one of the Hijrah Group members received an ISIS booklet on how to perform hijrah and shared it with KOKAYI and other members:

| | |
|---|---|
| Sanchez | http://justpaste.it/hjra-book |
| P-4 | 😱 😱 🙈 🙈 👌 👍 😎 thanks for the share Nasr |
| P-8 | That's gonna help a lot |

---

[11] Smirking face emoji.

The cover of the on-line book and two several screenshots of the contents follow:



# CONTENTS

How Islamic State members get into & out of Syria ................................................... P5

INDEPTH Hijrah Advice 1: SUGGESTED SETUP FOR PACKING ...................................... P7

Hijrah Advice 2: Know Your Strengths & Weaknesses ................................................ P14

Hijrah Advice 3: GETTING STOPPED IN TURKEY ......................................................... P16


How Operatives Get Through Airport Security Without Blowing Their Cover .................. P23

Abu Rumaysah skips his bail conditions and escapes the UK by Bus ................................. P24


Stories of Arab Fighters Migration to Syria ................................................................. P25

- Muhammad al-`Ubaydi ........................................................................................... P25

- Al-Muhajir al-Rimi .................................................................................................. P26

- Abu Thar al-Bahraini .............................................................................................. P27

- Abu Thabit al-Jazrawi ............................................................................................ P28

- Two Stories of Anonymous European Foreign Fighters ............................................. P29


A brother from UK (England) tells his emigration story to al-Sham (2013) ...................... P30

A sisters Hijrah Story to al-Sham (2014) .................................................................. P36

British jihadist stabs man who insulted Prophet, boasts of escape to Syria (2015) .............. P38


Interview with Abu Hurayra al-Ameriki – a miracle story ............................................. P41

Twitter Accounts: ................................................................................................... P47

Ahadith on Hijrah ................................................................................................... p48

Further Reading ..................................................................................................... P50

## Hijrah Advice Part 3 - GETTING STOPPED IN TURKEY

In shā Allah , I will try to shed light on two issues concerning which I have been receiving some queries. Some of you have asked what the Turkish authorities will do to you if they stop you.

### First of all, there are two instances where they can stop you:

At the immigration office in the Turkish airport, while verifying your passport and whatnot, and
When you will be in Turkey, travelling down south to the border.

Bear in mind that if they stop you, it doesn't mean that they will automatically deport you or detain you or put you through an unwanted situation. It's a toss-up. Trust in Allah.

In the first instance above, depending on factors such as your appearance, your country of origin, your (international) criminal record, etc., the worst they can do to you is deport you and/or detain you. I need to state the risks as they are, but, subhān Allah don't get paranoid or discouraged by that. I know one brother from the US who was saying that the FBI was on his back almost daily. However, he made it here passing through all the trials that this hijra posed, Al-HamdulilLah. Place your trust in Allah.

In the second instance, after you get through airport security, you need to know that if (i) you have a valid tourist visa to be in Turkey, (ii) you don't have some kind of an international search warrant on your head, (iii) you're not on any terrorist list or out of favour with the intelligence services of your country, and (iv) you don't have any incriminating material on your person or in your luggage , then, the Turkish authorities cannot arrest and detain you. All they can do is stop you, request you to produce identification (your passport, most probably), ask you a few questions, probably take you to a police station and ask you some more questions. Beyond that, they cannot do much more, bi-idhnilLah. According to the Turkish brother, some of the questions they might ask you are:

• "What is your purpose in Turkey?" - Just reply, "Tourism." And it's better if you know beforehand some of the tourist attractions of the area you are in or which will be on your way to the border. E.g. the Blue Mosque in Istanbul, the Tomb of Ataturk (la'natulLah 'alayh) in Ankara, the birthplace of Ibrāhīm AS in Urfa. Learn as much as you can about the tourist attractions found in the places on your itinerary.

• "Are you going to Syria?" - You can either flat out lie and answer in the negative and talk some more about how you want to visit the grave of Abu Ayyūb al Ansāri RA... Or you can invent a story about how you viewed a YouTube video about Syria and that moved you so much that you absolutely wanted to help the people (and that's true, Al-HamdulilLah) and that's why you're in Turkey to see if you can do anything to alleviate their plight. But still, don't say that you want to cross the border and enter Syria.

• "Are you a terrorist? Are you (linked to) al-Qaeda? Do you want to go to Syria to join al-Qaeda?" - The Turkish authorities don't differentiate between al-Qaeda and ISIS. They still think that ISIS and al-Qaeda are the same thing. You should categorically deny any links and push forward the tourism agenda to the maximum. However, be sure NOT to have any "incriminating" materials with you which would negate your story. This includes knives & weapons, combat boots, camouflage clothing, etc.: basically anything which screams out that you want to get your feet dusty.
So, in shā Allah, take your precautions:
Make sure your plane ticket is a return (two-way) ticket.

16

**B. The Defendant Repeatedly Lied to the FBI About His Own Desire to Perform Hijrah and Jihad, and That of Others**

As the Statement of Offense makes clear, KOKAYI lied numerous times in two separate interviews with the FBI, once at Dulles International Airport, and a second time in his home after he was informed that the FBI had arrested his brother.   In each voluntary interview KOKAYI was given numerous opportunities to tell the truth and admit activities known to him, but in each instance he lied about his support of ISIS, his knowledge of other people who supported ISIS, his knowledge of persons (including himself) who wanted to fight jihad for ISIS against the United States and its allies, and knowledge of persons (including himself) who he knew wanted to travel to support ISIS by performing hijrah to ISIS territory.   Each of these lies were material to the ongoing FBI investigation into persons in the District of Columbia and elsewhere who may be providing material support to ISIS.   Additionally, KOKAYI lied about his attempts to radicalize others, his consumption and distribution of ISIS propaganda to persons inside the United States, and P-4's support of ISIS and desire to commit hijrah and jihad for ISIS.

These statements were significant to the FBI investigation, which was concerned about the activities of the Hijrah Group and others.   Of particular importance, ISIS is a dual threat.   First, it was highly successful in recruiting foreign fighters from the U.S. and elsewhere to travel to ISIS territory and engage in fighting against U.S. and allied troops.   Second, and of greater concern, ISIS called upon its supporters in the West to commit spectacular terrorist attacks in the West, whether by knife, truck, or firearms.   While both concerns were present here, this second concern was even greater based on the groups' connection with P-1.   When OFAC designated P-1 a SDGT in December 2017, it recognized that P-1 was closely associated with several persons who

committed terrorist acts in the United States and Europe.  See "Treasury Sanctions Jamaica-Based   ISIS   Recruiter,   located   at   https://www.treasury.gov/press-center/press-releases/Pages/sm0231.aspx (December 7, 2017).   KOKAYI's numerous false statements made it impossible to accurately assess the Hijrah's Group's ability and intent to support ISIS, and in what capacity.

While it is true that none of the members of the Hijrah Group have, to date, attempted to travel to ISIS territory, the government believes the reasons for this have more to do with happenstance and the intervention of law enforcement.   The Hijrah Group was meeting regularly from August 2014 through early 2017 in KOKAYI's home (owned by P-2) in the District of Columbia, and members of the group were still preparing to travel, and were saving money to travel to ISIS territory.   In late 2016, however, ISIS began to suffer steep battlefield losses in Iraq and Syria, including its ties to the Turkish border where most foreign travelers crossed into ISIS territory.   Law enforcement was also stepping up its efforts to try and interdict foreign fighters who wished to travel to fight for ISIS.   This changing situation had an impact on KOKAYI.   In July 2016, KOKAYI met with a law enforcement undercover employee (UCE) who was introduced to KOKAYI by P-1 as a possible match for marriage.   The conversation was recorded, and UCE spoke to KOKAYI about his intention to possibly travel and fight jihad for ISIS.   See Attachment 1.   In the conversation, KOKAYI acknowledged that he wanted to travel to Syria and Iraq (Raqqa or Mosul) as the "end goal," but "right now it's really hard apparently . . . [ ] they've been doing a lot of bombings and stuff in Mosul. But even trying to get there from either way is difficult because now, especially for Muslims, they've been watching as soon as they try and get in, you know, flight somewhere."   Id.

Around the same time in late 2016, ISIS publicly called upon foreign supporters to commit terrorist attacks against the West in case they could not come to ISIS territory.   Thereafter, there were numerous terrorist attacks committed by ISIS-inspired terrorists in the United States and Europe in 2016 and 2017.   In 2017, the ISIS reversals on the battlefield continued, and Mosul was liberated from ISIS control in July 2017.   Meanwhile, the Hijrah Group was also suffering from internal divisions.   In April 2017, SANCHEZ and P-3 had broken up because SANCHEZ was having an affair, and SANCHEZ was ostracized from the Hijrah Group.   Shortly thereafter, on or about August 25, 2017, P-1 was arrested and detained in Jamaica in on New York State terrorism offenses.   P-2 was also briefly detained and questioned by Jamaican authorities during that encounter.   In January 2018, P-2 left P-1 and Jamaica to come back to the United States, and P-2 was questioned by the FBI on her return.   P-2 indicated she was Islamicallly divorced from P-1 and was planning to stay back in the United States.   In July 2018, the FBI questioned KOKAYI at Dulles Airport on his way back from Egypt, where he had met with his future wife. In August 2018, P-4 was arrested in Virginia for sex crimes associated with a minor, and KOKAYI was again questioned by the FBI (and lied).[12]   In addition, starting in at least June 2019, the FBI and the U.S. Attorney's Office took overt investigative steps that were known to KOKAYI and other members of the Hijrah Group.

### C.  KOKAYI Has Been Cooperative with Law Enforcement since December 2020

---

[12] These statements are laid out in the Statement of Offense.   While KOKAYI's statements in August 2018 were similar to those from July (and he adopted those prior statements in the August interview), they were in fact much broader and more serious because he was also specifically lying to protect his brother who had been arrested on serious crimes.   P-4's desire to travel to ISIS territory and perform jihad were material issues that were raised at P-4's sentencing hearing because P-4s conduct included radicalization of the minor victim.

KOKAYI was aware that the government was investigating his activities since at least early 2019, and that the government was interviewing persons close to him, including persons from the Hijrah Group.   KOKAYI did not reach out to the government during this period, but after the government sent KOKAYI a target letter in December 2020, he obtained counsel and agreed to debrief with the United States.   The government met with the defendant on two occasions, and he answered questions from the FBI and the U.S. Attorney's Office. After debriefing, the defendant agreed to carry a GPS-monitoring device provided by the FBI until he decided to plead guilty.   Thereafter, KOKAYI pled guilty early in this matter and agreed to enter a preindictment guilty plea.   This decision saved significant government and judicial resources, including voluminous discovery.

### D.  The Government is Concerned that KOKAYI Still Has Extremist Views

While KOKAYI claims he no longer believes that P-1 was correct, or that ISIS is a true Caliphate, the government is concerned that KOKAYI may still harbor extremist views that would place him at risk of future recidivism and potentially becoming an active supporter of a foreign terrorist organization that shares his religious views.   The government readily acknowledges that KOKAYI has a constitutionally protected right to believe what he wants to believe, but his allegiance to this view makes him vulnerable to violent extremism.   This risk is a factor that the government believes the Court must account for in any sentence.

### **Determining the Sentence**

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range[,]" which is "the starting point and the initial benchmark" for the sentence to be imposed. Gall v. United States, 552 U.S. 38, 49 (2007).   "Then, 'after giving both

parties an opportunity to argue for whatever sentence they deem appropriate,' the court considers all of the section 3553(a) sentencing factors and undertakes 'an individual assessment based on the facts presented.'"   United States v. Akhigbe, 642 F.3d 1078, 1084 (D.C. Cir. 2011) (quoting Gall, 552 U.S. at 49-50).

Under § 3553(a), "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).   The purposes of sentencing are as follows:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).   The Section 3553(a) factors also include the following:   (1) "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (2) "the history and characteristics of the defendant," id.; (3) the Guidelines and Guidelines range, § 3553(a)(4); (4) any pertinent policy statement issued by the Sentencing Commission, §3553(a)(5), and (5) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6).

Of course, a "sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," Rita v. United States, 551 U.S. 338, 351 (2007), and it "may not presume that the Guidelines range is reasonable," Gall, 552 U.S. at 50; Nelson v. United States, 555 U.S. 350, 350 (2009).   As discussed below, the government believes that an upward variance is supported by the § 3553(a) factors.

A.    **United States Sentencing Guidelines Calculation**

Under United States v. Booker, 543 U.S. 220 (2005) and its progeny, in fashioning the appropriate sentence the Court must undertake a multi-step process beginning with a correct calculation of the applicable Guidelines range, based on findings of fact. However,

> In so doing, [the court] may not presume that the Guidelines range is reasonable . . . [but] must make an individualized assessment based on the facts presented. If [the court] decides that an outside-Guidelines sentence is warranted, [the court] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. . . . After settling on the appropriate sentence, [the court] must adequately explain the chosen sentence to allow for meaningful appellate review [under an abuse-of-discretion standard] and to promote the perception of fair sentencing.

Gall v. United States, 552 U.S. at 49-50 (citations omitted).

The government agrees with the PSR's conclusion regarding the applicable Guidelines Range -- -with a Category I Criminal History (with which the government also agrees), and a two point subtraction for acceptance of responsibility (level 4), the PSR calculates the Guidelines range as level 4, which is 0-6 months.  This calculation creates a significant anomaly.  The Guidelines were designed in large part to create predictability in sentencing and to avoid cases where defendants who committed the same crime would be treated differently sentencing, even if their actual charge of conviction differed.[13]   The defendant's statements here undeniably involve

---

[13]  According to U.S.S.G. §1A1.3 (emphasis added):

> **To understand the guidelines and their underlying rationale, it is important to focus on the three objectives that Congress sought to achieve in enacting the Sentencing Reform Act of 1984.** The Act's basic objective was to enhance the ability of the criminal justice system to combat crime through an effective, fair sentencing system. **To achieve this end, Congress first sought honesty in sentencing**. It sought to avoid the confusion and implicit deception that arose out of the pre-guidelines sentencing system which required the court to impose an indeterminate sentence of imprisonment and empowered

international terrorism. If the defendant pled guilty to the 8-year offense under 18 U.S.C. §1001(a)(2), the Guideline Statutory Index directs the Court to U.S.S.G. § 2J1.2, with a and resultant guideline calculation that starts at level 26, with an adjusted guidelines range after 3 levels for acceptance of responsibility of 23, with a guideline range of 46-57 months.[14]   In contrast, in this case, since the defendant pled guilty to the 5-year maximum offense under the same statute, the Statutory Index directs the Court to U.S.S.G. §2B1.1, and a resulting level 6 offense, with a guideline range of 0-6 months, with no other enhancements available.   This distinction is more anomalous because when Congress directed the Commission to increase the punishment in cases involving international terrorism, it did not distinguish regarding the statute of conviction.   See Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. 108–458 (Dec. 17, 2004), § 6703(b) ("Not later than 30 days of the enactment of this section, the United States Sentencing Commission shall amend the Sentencing Guidelines to provide for an increased offense level for an offense under sections 1001(a) and 1505 of title 18, United States Code, if the offense involves international or domestic terrorism, as defined in section 2331 of such title").

The parties had active discussions about the above sentencing guideline incongruity in this case in discussing a possible disposition in this matter, and agreed to resolve the case with the

---

the parole commission to determine how much of the sentence an offender actually would serve in prison. … **Second, Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders. Third, Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity.**

[14] The applicable Guideline for the 8 year charge according to the Statutory Index is § 2J1.2, which is a base level 14, plus a 12 level enhancement under U.S.S.G. §2J1.2(b)(C) because the 8 year enhancement applies for international terrorism, for a total of level 26.

parameters laid out in the plea agreement, which effectively was a guilty plea to an offense with a five year maximum sentence, but with an agreement that government may seek an upward variance of up to 24 month sentence.

**B.    Variance from the Guidelines Range Is Appropriate.**

The government submits that in this case, an upward variance in this matter is appropriate under the factors identified in 18 U.S.C. §3553(a).   The defendant's conduct was very serious. His actions had the effect of diverting substantial government resources that were intended to protect the United States from terrorist acts, and he requires specific deterrence from considering future criminal conduct to support terrorist organizations.   Taken together, the government believes that the appropriate sentence for the defendant's offense under § 3553(a) would be 24 months of incarceration.

**C.    Application of the Section 3553(a) Factors**

**1.    Nature and Circumstances of the Offense**

As set forth above, KOKAYI's actions were incredibly dangerous.  He had significant ties to P-1, and he was a long-time ISIS sympathizer who spread ISIS propaganda and wished to travel to ISIS territory to fight violent jihad on its behalf.   He also was part of a group of similarly minded individual who wished to support ISIS and were also willing to die on its behalf.   To conceal those facts, he lied repeatedly to the FBI in a terrorism investigation and interfered with the FBI's ability to fully understand the group's intentions and motives to support ISIS.   As set forth above, ISIS leaders repeatedly called on its supporters to travel to ISIS territory to fight jihad against the West, and if they could not do so, to commit terrorist attacks where they were. KOKAYI's repeated decision to lie about his own intent, and the intention of others in his group

22

are therefore far more serious than the ordinary criminal case. The federal government has been forced to expend significant resources to monitor and investigate persons like KOKAYI and the Hijrah Group to ascertain whether they are part of a terrorist threat that was living five minutes' drive from the White House, in the nation's capital.   Thus, lying to the FBI in a case involving international terrorism places the entire community at risk – a fact that Congress recognized when it directed the Sentencing Commission to increase the guidelines in such cases.   See Pub. L. 108–458 at § 6703(b) ("the United States Sentencing Commission shall amend the Sentencing Guidelines to provide for an increased offense level for an offense under sections 1001(a) . . . if the offense involves international or domestic terrorism").

### 2.      History and Characteristics of the Defendant

Next, section 3553(a)(1) requires the court, in determining the sentence to be imposed, to consider "the history and characteristics of the defendant."   KOKAYI has a mix of concerning and positive facets to his character.

First, the defendant has had a long-standing desire to commit jihad and die a shaheed.   In the July 2016 conversation with the UCE, KOKAYI acknowledged he wanted to die a shaheed, and that:

> That's always been the plan since, mmmm . . . [ ].   Since a long time, so, yeah.   …   [ ] Nah this has been something like even before, you know, my mom was into it, um I just, 'cause, back when we were younger we learned that, like uh, what shaheeds get and stuff in Jannah, they don't have to go through the pain of death, or the trials of death and it's like, when we learned about the trials of death- 'cause we learned about the punishment in the grave before then, and then we learned about uh the Shaheed, and then I'm like, "Yeah that's the only way to go" and then, yeah also because like I'm really interested in the last days, like kind of the last days and whatever.

Attachment 1.   The defendant's long-standing desire to die a shaheed presents the real concern

that he may become a future supporter of ISIS or another foreign terrorist organization.

He also has ties to Egypt that are concerning.   According to the PSR, KOKAYI is presently married to an Egyptian national who is living in Egypt.   The government has no evidence to suggest KOKAYI's wife is an ISIS sympathizer.   It should be noted that in a conversation with the UCE in July 2016, KOKAYI acknowledged that because of the difficulty in getting to ISIS territory directly from the United States, that he may try and get to ISIS territory by first going to Egypt because he had family there and it would cause less suspicion.   Id.   As such, the government believes that future restrictions on the defendant's foreign travel are appropriate.

KOKAYI's current housing situation is a risk factor.   KOKAYI is currently living with P-8 and P-2 (his mother) at P-2's home in the District of Columbia.   As discussed above, P-8 was a member of the Hijrah Group.   After P-2 married P-1 in August 2014, P-2 encouraged the Hijrah Group to support ISIS, and P-2 knew that members of the group, including P-4 and KOKAYI, wanted to perform hijrah to ISIS territory.   P-2 actively encouraged KOKAYI and P-4 to support ISIS, and she encouraged the Hijrah Group to regularly listen to P-1's lectures that included religious encouragement to those who wished to perform hijrah to ISIS territory.   While living in Jamaica with P-1, P-2 also received donations intended for P-1 because P-1 had been blocked by several international money transmitters from conducting any financial transactions, one of which indicated was due to P-1's prior conviction related to terrorism.

On the positive side, the government recognizes that KOKAYI has had a relatively stable upbringing and has maintained regular employment for several years.   KOKAYI has no prior arrests or convictions, and he finished high school and two years of college education.   The

defendant also agreed to debrief with the Government after he was served with a target letter and has assisted the FBI in trying to understand his current risk to the community.   He also does not appear to have any drug or alcohol problems.

### 3.   Respect for the Law and Deterrence.

Section 3553(a)(2)(A) & (B) requires the Court, in determining the sentence to be imposed on the defendant, to consider the need for the sentence to promote "respect for the law" and to "afford adequate deterrence to criminal conduct."   There are two aspects of deterrence, specific and general.   The government believes that a period of incarceration is necessary to specifically deter KOKAYI from engaging in future criminal activity, including possibly providing material support to ISIS or another foreign terrorist organization in the future.   While a case could be made for a higher sentence given the conduct at issue, the government believes general deterrence will also be served by the proposed term of incarceration, in that the sentence punishes KOKAYI for the serious conduct, but also rewards KOKAYI for his preindictment plea and decision to cooperate with the government.   In so doing, the Court can send a message to persons who may find themselves in KOKAYI's position: do not lie to law enforcement because serious punishment lies ahead.   The proposed sentenced of 24 months succeeds in respecting both aspects of deterrence.

### 4.   Consideration of the Applicable the Guidelines Range

The government acknowledges that the advisory Guidelines range should be given due weight but believes that range to be flawed.   The government believes that even after the Court gives due consideration to the calculated Guidelines Range, the other 3553(a) factors favor the variance proposed by the government.

### 5.       Avoiding Unwarranted Sentencing Disparities

Section 3553(a)(6) requires the Court, in determining the particular sentence to be imposed on the defendant, to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

KOKAYI's case is remarkably similar to another case that was prosecuted in this District. In United States v. Masoud Khan, 19-CR-007 (KBJ), the defendant in that case wanted to travel to ISIS territory and fight jihad to support ISIS.   Khan, like KOKAYI, was a P-1 follower who supported ISIS and wanted to travel and die a shaheed for ISIS, but who did not ultimately attempt to travel.   Instead, Khan sought advice on hijrah and jihad from P-1, and he wired money to P-1 in Jamaica in the name of P-2.   Khan also donated to P-1 an automobile part that P-1 had requested, and Khan dropped off that part to P-2 who was then staying with KOKAYI while P-2 was visiting the United States.   Khan, like KOKAYI, lied multiple times to the FBI and other federal law enforcement officers about his contacts with P-1 and his desire to commit hijrah and jihad for ISIS.   Khan also, at the behest of P-1, deleted his encrypted communications with P-1 to hide the extent of their relationship from the FBI.   Khan was arrested and detained and pled guilty to Obstruction of Justice. Khan thereafter provided substantial assistance to the United States.   On August 13, 2019, the Court applied U.S.S.G. §2J1.2, departed downward under U.S.S.G. 5K1.1 to credit Khan's substantial assistance to the government, and sentenced Khan to 20 months of incarceration, followed by three years of supervised release with numerous special conditions that are consistent with the special conditions requested in this case. In another case not involving the 1001(a)(2) 5-year maximum, United States v. Ahmed, 472 F.3d 427 (6th Cir. 2006), the Court affirmed an 18-month sentence for a TSA security guard who had been

previously discharged from the Air Force because of his verbal support for Osama bin Laden, and lied about that act on his TSA application, but committed no other crime.

**Special Conditions of Supervised Release**

The government remains concerned that KOKAYI, upon his release, may continue to hold extremist views and thereafter attempt to provide material support to ISIS or a similar/successor foreign terrorist organization.   Fundamentalists who are motivated by religion to commit violent crime tend not to exhibit the same flags or triggers to their criminality as other persons in the criminal justice system: unlike traditional factors of recidivism, fundamentalists may regularly attend religious services, avoid re-arrest, maintain employment, have stable families, and avoid drugs and alcohol.   Instead, their radicalization risk factors tend to be more focused online and with close friends with whom they can share their ideology.   KOKAYI was radicalized online with his friends and family, as he listened to P-1's lectures, and regularly obtained, consumed, and shared ISIS propaganda.   The government therefore recommends the following special conditions of supervised release that have been identified by Probation in the PSR at ¶¶  9 and 85:

> (1) He refrain from any contact, directly or indirectly, with P-1 or any person who has been designated, or is a member of a group so designated, by the United States as a SDGT, through any medium, including social media (this includes any ISIS members);
>
> (2) He refrain from viewing, reading, or watching, or reviewing material, videos, lectures or books created, authored, or dictated by P-1 or any person designated by the United States as a SDGT, regardless of whether it is on-line, on television, or through social media;

(3) Probation be permitted to monitor and search his computer and electronic devices, including mobile phone, to monitor his access to restricted persons and restricted material;

(4) Probation be permitted to polygraph the defendant upon request to ensure his compliance with his conditions;

(5) Probation be permitted to search his residence as requested to ensure his compliance with his conditions;

(6) He complete any violent extremism treatment plan recommended by Probation, for a period of one year;

(7) He refrain from communicating on-line in a foreign language without prior approval from Probation;

(8) Probation be permitted to use location monitoring and for the defendant to refrain from travel outside the Washington, D.C, Maryland and Virginia area unless agreed to by Probation or the Court;

(9) He refrain from international travel without Court approval; and

(10)  He perform at least 200 hours of community service as directed by Probation.

## <u>Conclusion</u>

For the reasons stated above, the government requests that this Court vary upward from the Guidelines Range and sentence the defendant to a custodial term of 24 months' incarceration followed by a maximum term of supervised release (36 months) with the special conditions delineated above.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793

By:        _____/s/_____
Tejpal S. Chawla
Assistant United States Attorney
D.C. Bar. No. 464-012
555 4th Street, N.W.
Washington, D.C. 20530
202-252-7280 (Chawla)
Tejpal.Chawla@usdoj.gov

29